## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| | * | |
| v. | * | Criminal No. JFM-05-061 |
| | * | Civil No. JFM-11-953 |
| | * | |
| TERRENCE SMITH | * | |
| | ****** | |

### MEMORANDUM

Terrance Smith filed a *pro se* motion under 28 U.S.C. §2255.  Thereafter, counsel was appointed to represent him in connection with one issue that is presented: whether his sentence should be substantially reduced and whether he should be retried on charges that were based upon the allegation that he violated the federal witness tampering statute, 18 U.S.C. §1512(a)(1)(C).  By agreement of the parties, that issue has been fully briefed and is ripe for decision.  After this Memorandum has been issued, the Government will file a memorandum addressing the other issues that Smith has raised as a *pro se* litigant.

I find that need not be retried on counts that are premised upon a violation of 18 U.S.C. §1512(a)(1)(C).  I note, however, that the issue presented is a close one.

### I.

Smith was the leader of a Bloods gang that was responsible for the firebombing of Edna McAbier's home.  The remaining facts are set forth in the Government's response to Smith's supplemental motion, and I will simply repeat them here.

"At the time of the firebombing of her home on January 15, 2005, Edna McAbier was the

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND
2012 APR -2
CLERK'S OFFICE
AT BALTIMORE
BY:

1

President of the Harwood Community Association. JA 89.[1] Ms. McAbier had lived at 328 E.

Lorraine Avenue for 22 years. JA 87. In the last several years or so prior to the firebombing, the

neighborhood began to see more crime as the drug trade moved in. JA 89, 91. By the year 2005,

drugs had become a major problem in the Harwood Community. JA 91. This caused Ms.

McAbier to report drug activity directly to law enforcement. JA 92. Ms. McAbier began

communicating information to law enforcement by emails and by telephone, and she even

provided a running log of criminal activity to law enforcement. JA 92-93.

Ms. McAbier testified that she began experiencing acts of retaliation against her in 2003

while she was communicating with the police. JA 94-95. Initially someone spray-painted her

door. JA 94. People would urinate on her steps and tear up her flowers. JA 94. People threw food

on her car and scratched and marked her car with magic markers. JA 94. She found her tires

slashed and someone scratched the word "bitch" on the trunk of her car. JA 95. In response,

marked police cars were sent to her home, and the police presence seemed to help. JA 96. She

continued to relay information to the police, both on her own account and from other persons in

the community who feared retribution. JA 96.

On January 15, 2006 at about 1:30 a.m., Ms. McAbier heard thuds which she thought

were bricks being tossed onto her roof. JA 97. She grabbed her telephone and called 9-1-1, after

smelling gasoline coming from the area of her bedroom window. JA 98-99. She knew that

someone had firebombed her home. JA 98.

The government called Lieutenant James Rubeling, a Baltimore City Fire Investigation.

He responded to the scene at 328 E. Lorraine Avenue on January 15, 2005. JA 70. He examined

the crime scene and oversaw the collection of evidence. JA 71. Lieutenant Rubeling testified that

---

[1] "JA" refers to the joint appendix that was prepared in connection with Smith's direct appeal. I note that Smith's conviction was affirmed by the Fourth Circuit, and that a petition for writ of certiorari was denied by the Supreme Court.

he recovered at least five molotov cocktails on and around Edna McAbier's home. JA 71-89, 96-97.

Major Steven Lukasik, a veteran of twenty three years with the Baltimore City Police Department, testified that in 2004, when he arrived in the Northern District where Harwood is located, it was inundated with drug trafficking and violence. JA 107. It was so bad they could not send in a police car alone into the 300 and 400 block of Lorraine Avenue. JA 107. In 2004, in the Harwood Community, an area he described as "small, tiny", Major Lukasik testified that there were in excess of a hundred calls for narcotics violations. JA 107. Major Lukasik personally observed a lot of narcotic trafficking as a result of gang activity. JA 107. It was commonplace to see people displaying the red colors associated with the Bloods organization in that location. JA 107.

Major Lukasik also testified that he met Edna McAbier at a community forum. JA 109. Ms. McAbier provided him with emails and spread sheets. JA 109. As a result of that information, Major Lukasik deployed officers to the Harwood Community including their drug unit and members of the Organized Crime Division. JA 109-110.

The government called several cooperators who testified regarding the firebombing. Isaac Smith testified that he was a drug dealer and a member of the "Bloods" gang involved in the firebombing. JA 139. Isaac Smith testified that he had sold drugs for Nakie Harris in the Harwood neighborhood and others since at least 1998. JA 144, 169. Terrence Smith, "Buck," was the Lieutenant in charge of this Bloods gang. JA 146. Richard Royal was a member of the Bloods but did not belong to their sect. JA 146-147. Nakie Harris was not a member of the Bloods, but knew Terrence Smith from the streets. JA 147-148.

On the night of the firebombing, Terrence Smith called a meeting at his house and told

persons there, including Isaac Smith, that he wanted them to go bomb Ms. McAbier's house. JA

149. Isaac Smith had known Edna McAbier for about ten years. JA 149. Isaac Smith testified

that Terrence Smith ordered the firebombing because Ms. McAbier was calling the police too

much, and it was interfering with the people Terrence Smith had selling drugs in Harwood. JA

150. The Bloods gang made their money selling drugs. JA 171. On the same night, Terrence

Smith also asked Isaac Smith to kill Richard Royal because he believed Royal was talking to the

police. JA 152.

　　　　After Terrence Smith ordered the firebombing, Andre Wilkins drove Isaac Smith, Brian

Harrison, Cedric Bowman, Richard Royal and Jackie Brewington to two gas stations to buy

gasoline and lighters. JA 159. Richard Royal went into "Kitty's," a bar across from the gas

station and bought a six pack of beer. JA 160. The six men went to a house where they drank the

beer and Nakie Harris filled the bottles with gasoline. JA 163-164. Nakie Harris soaked rags in

gasoline and put them in the bottles. JA 164. Andre Wilkins directed Shakia Watkins to make a

phone call from a phone booth to divert the police down the hill. JA 165. After Watkins made the

phone call and called Wilkins back, Nakie Harris and Isaac Smith went to the front of the

victim's home, and Richard Royal, Cedrick Bowman, Jackie Brewington and Brian Harrison

went to the rear of the victim's home. JA 166-167. They threw their gasoline-filled bottles at the

victim's home and fled the area in the van driven by Andre Wilkins, who was waiting for them.

JA 167.

　　　　Andre Wilkins testified that he was a member of the Bloods and was selling marijuana

and ecstasy at the time of the firebombing. JA 204, 207. Andre Wilkins corroborated the

testimony of Isaac Smith regarding the planning of the firebombing and driving the co-

defendants to get gas and to make the destructive devices. JA 209-217. Wilkins testified that Terrence Smith told him to firebomb the house. JA 211.

Jackie Brewington pled guilty and testified at trial. He testified that he was awakened and told to go to Terrence Smith's house that night. JA 376. The discussion at the house was to firebomb the victim's house because she was calling the police which was interfering with their drug sales. JA 376. Nakie Harris was selling crack cocaine in that area. JA 377. Other members of the Bloods were selling drugs there as well. JA 378. Brewington also corroborated the details of the gasoline purchase and purchase of the beer. JA 381. After the firebombing, Brewington, along with others, went to Terrence Smith's house. JA 384. Brewington stated, "Well, I bet she won't call the police no more. I bet she in there screaming for help." JA 384. After the defendants heard that the house did not burn, Terrence Smith ordered them to go back down and firebomb the house again. JA 384-385.

Tiara Demory was a member of the Bloods who was present at Terrence Smith's house when the conspirators planned to firebomb the home of Edna McAbier. JA 422. She corroborated the account (JA 423-429) and recalled the defendants complaining that Ms. McAbier was "snitching" and that they could not sell their drugs down the block. JA 423-429. Somebody needed to get rid of her. JA 423. First, the defendants discussed shooting her. JA 424. The plan changed, and Terrence Smith decided that they would firebomb the victim instead. JA 424. After the firebombing, Terrence Smith asked Tiara Demory if she would be scared to kill Jackie Brewington because Smith had heard that Brewington was "ratting". JA 429.

At trial, the government offered a video and audio recording made by Andre Wilkins. JA 224. The recording was offered as direct evidence of the drug dealing, of Terrence Smith's role as leader of the Bloods gang, and of the relationships of persons in the Bloods. JA 230. The

recording corroborated the witnesses' testimony regarding the existence of the Bloods gang and persons who were associated with the gang. JA 227. The recording showed that the Bloods talked on the recording about not "snitching" to the police. JA 241. After much discussion and after hearing argument, the Court admitted two segments of the video and audio recording. JA 252. The jury was instructed that Richard Royal and Nakie Harris were not in the video and audio recordings. JA 257.

Julie Ann Dolan testified that she was the supervisor of the Arson and Explosives Section at the Forensic Science Laboratory of the Bureau of Alcohol, Tobacco, Firearms and Explosives. JA 113. She tested several items recovered from the crime scene for the presence of ignitable liquids. JA 117-118. The items she tested contained gasoline. JA 117-120. Kenneth Erickson, an explosives enforcement officer with the Bureau of Alcohol, Tobacco, Firearms and Explosives testified that based upon the evidence he examined, six destructive devices were used in the firebombing. JA 134.

After the Rule 29 motion, the government reopened its case, and Special Agent Robert Brisolari, a veteran of over fourteen years with the Drug Enforcement Administration, testified that as a supervisor in the DEA Office in Baltimore, he was familiar with how cases were initiated and referred to the DEA. JA 576. The biggest source of referrals for drug cases in Baltimore were from the Baltimore City Police Department. JA 576. Six of the nine groups of DEA in Baltimore are task force groups, meaning that they were comprised of agents as well as sworn task force officers from other police departments . JA 577. The Baltimore City Police Department contributes the most task force officers to the DEA Baltimore District Office. JA 577. Special Agent Brisolari was familiar with the Northern and Eastern District corridors of Baltimore City, where this case arose. JA 577.

According to testimony at trial, some of the factors that DEA look to in reviewing a case for acceptance are the scale of the drug dealer, the organizational structure, the propensity for violence, and criminal histories of the persons involved. JA 579. There is a national priority to accept cases where drug-related violence exists. JA 580. The Drug Enforcement Administration also accepts cases for street-level drug trafficking in crack cocaine, cocaine, and heroin. JA 580. The defense asked no questions of SSA Brisolari. JA 581."

II.

All of the charges of which Smith was convicted, with the exception of the charge for unlawfully making destructive devices in violation of 26 U.S.C. §5801, *et seq.*, that is set forth in Count VI of the indictment, depend, directly or indirectly – upon Smith having violated the federal witness tampering statute, 18 U.S.C. §1512.  Section 1512(a)(1)(C) makes it a federal offense for anyone to

> prevent the communication by any person to a law enforcement
> officer or judge of the United States of information relating to
> the commission or possible commission of a Federal offense or
> a violation of conditions of probation, parole, or release pending
> judicial proceedings

In accordance with then prevailing Fourth Circuit law, I gave the jury the following instruction concerning the first element that the Government had to prove in order to establish a violation of this section.

> The first element the government must prove beyond a reasonable doubt, that the defendant attempted to kill another person. The second element that the government must prove beyond a reasonable doubt is that the defendant acted knowingly and with a specific intent to prevent the communication by any person to a law enforcement officer of the United States of information relating to the commission of a federal offense. Here, that is drug trafficking.
> By specific intent, I mean that the defendant must have acted knowingly and with the unlawful intent to induce Ms. McAbier to hinder, delay, or prevent the communication of information to a law enforcement officer of the United States.
> In order to satisfy this element, it is not necessary for the government to prove that the defendant knew he was breaking any particular criminal law nor need the government prove that

the defendant knew that the law enforcement officer is a federal law enforcement officer. What the government must prove is that there was a *possibility or likelihood* that the information being provided by Ms. McAbier about drug activities would be communicated to a law enforcement officer of the United States, irrespective of the governmental authority represented by the officers to whom she personally communicated information.

Also, I shall instruct you that drug trafficking is a federal offense. Again, however, it is not necessary for the government to prove the defendant knew that drug trafficking is a federal offense. The law does not require that a federal proceeding be pending at the time or even that it was about to be initiated when the attempted action, threat, intimidation or corrupt persuasion was made, nor does the law require that the recipient of the intimidation must be involved in an ongoing federal investigation or in an investigation of a federal crime." JA 708-709.

Thereafter, on May 26, 2011, the Supreme Court decided *Fowler v. United States*, 131 S.Ct. 2045 (2011), which held that, to support a federal witness tampering conviction under Section 512(a)(1)(C), "the Government must show that there was a reasonable likelihood that a relevant communication would have been made to a federal officer." Resolving a split among the circuits, the Supreme Court ruled that an instruction similar to the one I had given was erroneous to the extent that it indicated that the Government must only prove "that there was a possibility . . . that the information being provided by Ms. McAbier about drug activities would be communicated to a law enforcement officer of the United States."

The Government implicitly concedes, as appears appropriate, that the *Fowler* decision creates a newly recognized right that is cognizable on a §2255 motion. *See United States v. Lopez*, 248 F.3d 427 (5th Cir. 2001); *United States v. Lloyd*, 188 F.3d 184, 187 (3rd Cir. 1999); *United States v. Valdez*, 195 F.3d 544, 546 (9th Cir. 1999); *Haugh v. Booker*, 210 F.3d 1147, 1149 (10th Cir. 2000). Further, the Government also implicitly concedes, as again appears appropriate, that Smith's §2255 motion is timely because he raised the *Fowler* issue less than one year after the date of the decision.

The Government, however, makes two arguments on the merits. First, it suggests that because my instruction included both the words "possibility" and "likelihood," the instruction in

8

effect required the jury to find (as held in *Fowler*) that there was a "reasonable likelihood" that the information provided by Ms. McAbier would be communicated to federal law enforcement authorities. That argument is unpersuasive because the words "possibility" and "likelihood" were used in the disjunctive. As the Government acknowledges in footnote 2 of its response, the jury could have found either a possibility or a likelihood that the information provided by Ms. McAbier would be communicated to federal authorities.

Second, relying upon the Fourth Circuit's decision in *United States v. Ramos-Cruz*, 667 F.3rd 487, 497-98 (4th Cir. 2012), the Government contends that any error in the instruction was harmless. On this point I agree with the Government. I realize, as argued by Smith, that *Ramos-Cruz* is distinguishable in that there the witness who was killed was only a potential witness whereas in the instant case there had been a history of Ms. McAbier communicating only with local law enforcement authorities.[2] However, the evidence at trial established that federal and local authorities worked closely with one another through DEA task forces and that the task forces targeted the very type of criminal activity – violent street drug trafficking. Moreover, also present here are other factors to which the DEA looks in reviewing a case for federal prosecution: the scale of the drug dealings, the organizational structure, the propensity for violence, and the criminal histories of the persons involved. In short, the fact that Smith and his codefendants were members of the Bloods gang rendered it virtually inevitable that the information provided by Ms. McAbier would eventually be communicated to federal authorities and that federal prosecution would ensue.

---

[2] The fact that federal authorities inevitably would have become involved after Ms. McAbier's house was firebombed is, of course, immaterial. The charges here depended upon the firebombing itself occurring because of Ms. McAbier's communications with law enforcement authorities.

For these reasons I find that the error in the instruction that I gave concerning 18 U.S.C. §1512(a)(1)(C) was harmless.  The Government is directed to file a further response to Smith's §2255 motion on or before May 15, 2012.

Date: 4/2/12

_____
J. Frederick Motz
United States District Judge

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2012 APR -2 P 4: 37

CLERK'S OFFICE
AT BALTIMORE

BY___ ___ DEPUTY